**In re PERRY H. KOPLIK & SONS, INC., Debtor.**

**Michael S. Fox, as Litigation Trustee of Perry H. Koplik & Sons, Inc., Plaintiff,**

v.

**Michael Koplik and Marc Siegel, Personal Representative of the Estate of Alvin Siegel, Defendants.**

No. 12 Civ. 6784(PKC).

United States District Court, S.D. New York.

Aug. 14, 2013.

Christopher Robert Belmonte, Satterlee, Stephens, Burke & Burke LLP, New York City, for Plaintiff.

Ronald Lewis Cohen, Seward & Kissel LLP, New York City, Nancy Lynn Kourland, Sanford Philip Rosen, Rosen & Associates, P.C., New York City, Kenneth Michael Lewis, Lewis Law PLLC, White Plains, NY, for Defendants.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

This adversary proceeding arises in the context of the Chapter 11 bankruptcy of Perry H. Koplik & Sons, Inc. (the "Debtor"). The original defendants, Michael Koplik and Alvin Siegel (the "Officers"), were officers and directors of the Debtor, a closely held New York corporation that operated as a broker, sales agent, and distributor of various paper products. Defendant Koplik was the Debtor's sole shareholder. Plaintiff, the Debtor's litigation trustee (the "Trustee"), brought suit against the Officers alleging breaches of fiduciary duty, negligence and gross mismanagement, and certain fraudulent transfers. The Trustee's principal allegation was that the Officers breached their duties by authorizing excessive extensions of credit to one of the Debtor's major customers, American Tissue Inc. ("American Tissue" or "ATC"), which itself filed a Chapter 11 petition in September 2001, after a failed bond offering, and was soon revealed to be the subject of a financial fraud perpetrated by two of its senior executives. Among other things, the Trustee alleged that the Officers' lack of care caused the Debtor to lose its principal source of financing, a revolving credit facility, and compromised its ability to recover the sums lent to American Tissue under a trade credit insurance policy. The Trustee also alleged that, after the Debtor was insolvent, the Officers caused it to forgive loans to them, which, the Trustee asserted, constituted fraudulent transfers and breaches of the duties of care and loyalty.

After a trial before the Honorable Robert E. Gerber of the U.S. Bankruptcy Court for the Southern District of New York, the Bankruptcy Court issued its 107–page Proposed Findings of Fact and Conclusions of Law after Trial (as Amended) (the "Proposed Findings" or "PF").

*In re Perry H. Koplik & Sons, Inc.,* 476 B.R. 746 (Bankr.S.D.N.Y.2012). The Bankruptcy Court proposed that judgment be entered against the Officers, awarding the Trustee damages for certain breaches of the Officers' fiduciary duties to the Debtor and for certain constructive fraudulent transfers from the Debtor to the Officers. Before the Court are the Trustee's and the defendants' objections to the Proposed Findings, which the Court reviews *de novo* as to all non-core matters as to which an objection has been made.[1] 28 U.S.C. § 157(c)(1); Rule 9033(d), Fed. R. Bankr.P.

As will be explained, upon *de novo* review, the Court largely adopts the Bankruptcy Court's Proposed Findings. The Officers, one of whom was the Debtor's sole shareholder, caused the Debtor to experience considerable exposure to American Tissue through the extension of trade credit and loans. It appears from the record, however, that the Debtor's losses were principally the result of the unforeseen fraud at American Tissue, which caused the company to appear financially healthier than it was. The Trustee did not prove that the Officers knew of the fraud or that, through the exercise of reasonable care, they would have discovered it. Without the benefit of hindsight, the Officers' decision to extend trade credit to American Tissue, one of the Debtor's largest and, in the Officers' view, most important customers, was a reasonable business judgment. And the Court finds that, to the extent the Officers breached their duties in extending non-trade loans to American Tissue without adequate credit analysis, the Debtor's losses were caused by the American Tissue fraud, not the Officers' breach of duty. Thus, although the Court finds that the Trustee may recover for certain discrete breaches of duty and certain constructive fraudulent transfers, in the main, the Trustee cannot recover for the Officers' conduct in connection with the credit the Debtor extended to American Tissue. The Court further finds that the Trustee is entitled to prejudgment interest on his claims for breach of fiduciary duty, an issue not addressed by the Bankruptcy Court.

## BACKGROUND

### I. *Procedural History*

In March 2002, certain of the Debtor's creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code. The case was later converted from Chapter 7 to Chapter 11 and the Bankruptcy Court confirmed a reorganization plan for a controlled liquidation. Michael Fox was appointed as the Trustee.

On March 3, 2004, the Trustee filed a complaint against, among others, the Officers, seeking to recover damages arising out of the Officers' alleged breaches of fiduciary duty and negligence and gross mismanagement of the Debtor. The Trustee filed an amended complaint on July 17, 2006, adding claims for recovery of allegedly fraudulent transfers from the Debtor to the Officers (the "Amended Complaint"). The case was tried before the Bankruptcy Court, which issued Proposed Findings of Fact and Conclusions of Law on March 30, 2012. These, as amended on July 11, 2012, constitute the Proposed Findings to which the parties have raised objections.

### II. *Factual Background*

The factual background is, in material respects, undisputed. *See, e.g.,* Amended

---

**1.** Defendant Alvin Siegel died shortly before the Bankruptcy Court issued its Proposed Findings. (PF 1 n. 2.) Marc Siegel is the personal representative of his estate. The Court's references to the Proposed Findings or PF are to the slip opinion.

Joint Pre–Trial Order filed October 9, 2012 ("PTO").

In 1960, non-party Perry Koplik and defendant Michael Koplik founded the Debtor, a broker, sales agent, and distributor of paper products. (PF 5.) After Perry Koplik's retirement, Michael Koplik became President and Chief Executive Officer of the Debtor and was its sole shareholder at all relevant times. (*Id.*) Defendant Siegel was Vice President and Chief Operating Officer. (*Id.* at 6.) Non-party Michael Kelly, the Debtor' Vice President of Finance and Chief Financial Officer, oversaw certain aspects of the Debtor's business with American Tissue. (*Id.* at 21–22.) Although Perry Koplik remained a member of the Debtor's board of directors (the "Board") until his death in September 2001, the Officers were the only active members of the Board during the period in question. (PTO ¶¶ 5.70–5.72.) Prior to the Debtor's bankruptcy filing, it had roughly 50 employees. (PF 5.)

In 1999, the Debtor entered into a $60 million revolving credit facility (the "Revolver"), with Fleet Bank ("Fleet") as agent, secured by a first lien on certain of the Debtor's assets, including accounts receivable and inventory. (*Id.* at 6.) The availability of credit under the Revolver was based on the Debtor's available assets, principally its eligible accounts receivable and inventory. (*Id.*) The Revolver also imposed a number of restrictions on the Debtor. It required that the Debtor obtain Fleet's written approval before making certain kinds of investments or loans and imposed restrictions on the amount and nature of the Debtor's receivables. (*Id.*) Notably, the Revolver limited the eligible trade accounts receivable due to the Debtor from American Tissue to $15 million. (*Id.*) In connection with the Debtor's request to raise that limit to $15 million,

the Debtor agreed to obtain trade credit insurance with respect to its American Tissue receivables in that amount. (*Id.;* PTO ¶¶ 5.15, 5.113.)

To meet its obligation to obtain trade credit insurance, the Debtor entered into a trade credit insurance policy (the "Policy") with Lumbermens Mutual Casualty Company, a subsidiary of Kemper Insurance Companies ("Lumbermens" or "Kemper"). (PF 7.) Although the Policy had a face value of $15 million, Kemper was only liable for 85% of the nominal $15 million in coverage and its duty to pay was further reduced by a $1 million deductible; thus, the maximum payout under the Policy would be $11.75 million if the Debtor suffered a covered loss of $15 million or more in trade credit. (*Id.*) Coverage under the Policy was also contingent upon the Debtor's compliance with a number of conditions. Among these were the requirements that the Debtor take all reasonable steps to avoid or minimize loss and that the Debtor not enter into certain agreements, including any agreement concerning the rescheduling of a covered debt, without Fleet's prior written consent. (*Id.*) The Policy further provided that it would be void if the Debtor made any materially false or fraudulent statements to the insurer or withheld any material information in connection with the Policy. (*Id.* at 7–8.)

From 1999 to 2001, with the Revolver and the Policy in place, the Debtor extended significant credit (exceeding $27 million at its peak) to American Tissue as both trade credit and outright loans. (*Id.* at 8.) The Officers also authorized the "re-aging" of certain American Tissue receivables from 30– to 60– and then to 90–day terms. (*Id.* at 8, 11.) During that time, American Tissue was one of the Debtor's largest customers. (*Id.* at 8.) Koplik also had a close working relationship with American

Tissue's CEO, Mehdi Gabayzadeh, who personally had guaranteed certain of American Tissue's debts to the Debtor. (*Id.* at 9; PTO ¶¶ 5.51a, 5.51g, 5.112.) In 1999, with Koplik's "consent," Gabayzadeh hired Ed Stein, then the Debtor's CFO and one of Koplik's trusted advisors, as American Tissue's CFO. (PF 9, 22.)

In addition to transactions with American Tissue, the Debtor made loans to Liberty Umbrella, a maker and distributor of umbrellas and other items from which the Debtor purchased promotional materials. (*Id.* at 58–59.) Notably, Liberty Umbrella was owned by Koplik's cousin and his wife, and the loans to Liberty Umbrella were authorized by Koplik, not Seigel. (*Id.*) Liberty Umbrella's outstanding debt to the Debtor stood at nearly $400,000 in December, 2001. (*Id.* at 59.)

American Tissue filed for bankruptcy in September 2001, following the failure of a proposed $400 million bond offering. (*Id.* at 41, 50.) On September 21, 2001, the Debtor filed a $14.995 million claim under the Policy in an attempt to recover amounts owed by American Tissue. (PF 32; PTO ¶ 5.53.) Shortly thereafter, in October 2001, one of American Tissue's creditors discovered that two of American Tissue's senior officers, Gabayzadeh and Stein, had falsified the company's financial statements, inflating revenues, improperly capitalizing expenses and assets, and otherwise overstating revenues and assets. (PF 50, 96.) Both executives were subsequently indicted on federal criminal charges, including bank and securities fraud. (*Id.* at 50.) Stein pleaded guilty and Gabayzadeh was convicted at trial. (*Id.*)

In October 2001, the Debtor retained Realization Services Inc. ("RSI") to assist the Debtor, among other ways, in finding a way to repay its creditors. (*Id.* at 51–52.) By October 28, 2001, however, RSI had

determined that the Debtor could not continue as a going concern. (*Id.* at 52.) On November 2, 2001, the Debtor's Board approved a plan for an out-of-court liquidation of the Debtor's assets. (*Id.* at 52.)

On November 9, 2001, Fleet notified the Debtor that it was in default under the Revolver. (*Id.* at 52.) The Debtor entered into a forbearance agreement with Fleet and its other lenders, dated November 12, 2001 (as amended, the "Forbearance Agreement"), in which the Debtor acknowledged a number of defaults under the Revolver, including the extension of over $8 million in loans to American Tissue, and agreed to a repayment schedule, higher interest rates, and the payment of a forbearance fee. (*Id.* at 43–46; PL's Exs. 7, 8.)

Also on November 12, 2001, Kemper disclaimed coverage under the Policy, denying the Debtor's nearly $15 million claim for amounts owed by American Tissue. (PF 32.) Kemper's November 12, 2001, letter denying coverage under the Policy (the "Denial Letter"), asserted a number of grounds for denying the Debtor's claim. (PL's Ex. 33A.) First, Kemper took the position that much, if not all, of the Debtor's claim was not covered by the Policy because the trade credit was extended at a time when American Tissue was two months or more overdue on its payments to the Debtor, in violation of the Policy's "Overdue Debtor Endorsement." (*Id.* at 1.) Second, Kemper stated that sales to three of American Tissue's subsidiaries were not covered by the Policy because those subsidiaries were not listed as "Approved Debtors" in the Policy. (*Id.* at 2.) Third, Kemper identified the Debtor's rescheduling of nearly $5 million in American Tissue receivables in March 2001 as a violation of a covenant in the Policy that required, among other things, that the Debtor obtain the insurer's prior written

consent before entering into any agreement providing for the rescheduling of the payment of a covered debt. (*Id.* at 3.) Fourth, Kemper reserved the right, upon further investigation, to deny coverage based on the Debtor's failure to adhere to its pre-existing credit practices, in violation of a Policy covenant. (*Id.*) Fifth, Kemper stated that the Debtor's "nearly quadrupling" of receivables from American Tissue, which it knew to be delinquent in payment, constituted a failure by the Debtor to take reasonable steps to avoid or minimize loss, in violation of a Policy covenant. (*Id.* at 4.) Sixth, Kemper suggested that the Policy "may" be void *ab initio* because the Debtor failed to disclose the status of the American Tissue receivables. (*Id.*) Kemper reserved the right to modify its position and assert additional defenses to coverage. (*Id.* at 5.)

In December 2001, after the Debtor's Board approved a liquidation plan but before the Debtor's bankruptcy filing, the Debtor forgave loans to Koplik and Siegel in the amounts of $299,800 and $100,000, respectively. (PF 60–67.) [2]

In January 2002, following Kemper's denial of coverage under the Policy, the Debtor retained the law firm Kirkpatrick & Lockhart LLP ("K & L") to prepare an assessment of the Debtor's insurance claim (the "K & L Assessment"). (*Id.* at 32.) The 32–page K & L Assessment analyzed the "minefield of defenses" raised by Kemper and ultimately concluded that the Debtor was "in a reasonably strong position to collect a portion of its initial claim, in the range of $2–9.6 million (taking into account the applicable deductible and coverage percentage)." (PL's Ex. 35 at RE–

500 66–67.) K & L recommended that the Debtor initiate negotiations with Kemper and, if necessary, pursue its claim through arbitration. (*Id.* at RE–500 67.)

Following the Debtor's involuntary bankruptcy petition in March 2002, and the subsequent appointment of the Trustee, the Trustee was able to recover from Liberty Umbrella all but $52,494 of its outstanding debt to the Debtor. (PF 59.) As to the Debtor's nearly $15 million claim under the Policy for trade credit to American Tissue, the Trustee, represented by K & L, pursued a claim against Kemper in arbitration but ultimately settled the dispute for $1.7 million before any award. (*Id.* at 36.)

### III. *The Bankruptcy Court's Proposed Finding Of Fact And Conclusions Of Law*

#### a. *Conclusions Of Law*

In adjudicating the Trustee's claims, the Bankruptcy Court was called upon to decide two pure questions of law. First, the Bankruptcy Court concluded that, under New York law, the Debtor's solvency at any given time was not relevant to whether the Trustee could recover for breaches of the Officers' fiduciary duties. (*Id.* at 79–81.) While solvency might be relevant in determining who may sue derivatively on behalf of a corporation (shareholders or creditors), in the Bankruptcy Court's view, the Officers owed fiduciary duties to the Debtor irrespective of its solvency and the Trustee was empowered to pursue claims for breaches of those duties on behalf of the Debtor. (*Id.*) Second, the Bankruptcy Court addressed whether the fact that the Debtor was a closely held corporation

---

**2.** Although the Proposed Findings describe the loan forgiveness as occurring "after the Debtor was already in bankruptcy" (PF 60), it appears that the December 2001 loan forgiveness took place after the Debtor's Board had approved a plan for an out-of-court liquidation in November 2001 but before the Debtor's creditors filed an involuntary bankruptcy petition in March 2002.

(with Koplik as its sole shareholder) affected the duties owed by the Officers. (*Id.* at 82–86.) The Bankruptcy Court concluded that "courts applying New York law would likely hold that while lower levels of formality are acceptable for closely held corporations, the duties of care and loyalty still apply." (*Id.* at 82.) No party has objected to these conclusions of law.

### b. Findings Of Fact And Mixed Questions

Applying these principles to the facts, the Bankruptcy Court found that the Officers had breached their fiduciary duties in some respects and that certain transfers from the Debtor to the Officers constituted constructive fraudulent conveyances. But it further concluded that not all breaches of duty had caused a recoverable loss.

The Bankruptcy Court found that the Officers' decision to extend $8.5 million in outright, unsecured loans to American Tissue was undertaken too hastily, without proper analysis, and without proper documentation, thereby violating the Officers' duty of care to the Debtor. (*Id.* at 94.) It also found, however, that the Trustee had not proven causation. The Bankruptcy Court reasoned that it was American Tissue's inability to pay, not the Officers' failure to obtain promissory notes or engage in corporate formalities such as holding board meetings, that had prevented the Debtor from recovering the amounts owed. (*Id.* at 95.) More significantly, the Bankruptcy Court found that the fraud at American Tissue—of which the Officers had no knowledge—constituted an "intervening factor" that broke the chain of causation. (*Id.* at 96.) Even if the Officers had exercised more care in reviewing and analyzing American Tissue's financial statements and other financial information, the Bankruptcy Court concluded that the Officers would have found a deceptively rosy picture of American Tissue's finances.

(*Id.*) The Bankruptcy Court also found that the Officers were not negligent in failing to look beyond the information they were given by American Tissue, or in extending credit to American Tissue in light of what they did know. (*Id.* at 96–97.) Thus, it concluded that the Trustee could not recover damages for the Officers' breach of the duty of care in connection with non-trade loans to American Tissue. (*Id.*)

Regarding the Debtor's extension of approximately $18 million in trade credit to American Tissue, the Bankruptcy Court differentiated between the portion of the trade credit that was covered by the Policy and the portion that exceeded the Policy's coverage. (*Id.* at 97–98.) Ultimately, it found that the Trustee could not recover damages as to either. As to the portion falling within the Policy's coverage, the Bankruptcy Court found that the extension of trade credit to American Tissue would not have been a breach of duty if the Officers had complied with the Policy's conditions, including the requirement that the Debtor not enter into any agreement concerning the rescheduling of covered debts without the insurer's prior written consent. Had the Officers done so, the Bankruptcy Court reasoned, the Debtor would have been substantially insured in the event of American Tissue's default on the trade credit. Thus, the Bankruptcy Court concluded that the extension of trade credit to American Tissue, insofar as it fell within the Policy's coverage limits, was not, in and of itself, violative of the Officers' duty of care. (*Id.*) For the trade credit that exceeded the Policy's coverage, the Bankruptcy Court found that the incremental increase in risk would have been justified by profit-making opportunities—again, had the Officers complied with the conditions of the Policy. (*Id.*) Thus, the Bankruptcy Court concluded that the Offi-

cers' extension of trade credit to American Tissue did not, standing alone, constitute a breach of the duty of care.

Separately, however, the Bankruptcy Court found that the Officers' failure to comply with the conditions for recovery under the Policy did constitute a breach of the duty of care. (*Id.* at 98–99.)[3] The Bankruptcy Court found that "the Officers had a shocking lack of knowledge of the requirements for recovery under the policy, and that, lacking knowledge of what they needed to do (and avoid doing) to recover under the policy, [the Officers] took measures that were violative of conditions for recovery." (*Id.* at 98.) Most notably, the Bankruptcy Court found that the Officers breached the duty of care by authorizing the re-aging of certain American Tissue receivables in March 2001. (*Id.* at 26–29.) The Bankruptcy Court also found that, with respect to compliance with the Policy's conditions, the fraud at American Tissue did not constitute an intervening cause: "Even with the fraud at American Tissue, the Debtor could reasonably have expected to recover all or substantially all of its $11.75 million in coverage under the Trade Credit Insurance Policy if the Officers had taken the steps necessary to protect the Debtor's rights to recover under it." (*Id.* at 99.) The Bankruptcy Court recognized the difficulty in calculating damages for this breach in light of the

fact that the Trustee had settled the coverage dispute for a fraction of the total claim after the Officers were no longer in control of the Debtor. (*Id.* at 71–73.) Ultimately, it fixed the damages for this breach of duty at $2.15 million, the difference between the maximum amount recoverable under the Policy ($11.75 million) and an "imputed" litigation recovery (had the Debtor not settled the coverage dispute) of $9.6 million, which was the high end of the range predicted in the K & L Assessment. (*Id.* at 103–106.)[4]

Additionally, although acknowledging that "[t]he Trustee did not sue separately for the incremental costs to the Debtor (*e.g.*, the higher interest rates, forbearance fee, and legal fees) resulting from the violations of terms of the Revolver" (*id.* at 46), the Bankruptcy Court noted that "the Trustee did introduce evidence of the incremental costs," and therefore awarded the Trustee $2,311,613 as damages for the Officers' breach of the duty of care in extending non-trade credit to American Tissue in knowing violation of the Revolver. (*Id.* at 103.)

The Bankruptcy Court also found that the Officers breached their duties of care and loyalty by authorizing the forgiveness of loans to themselves. (*Id.* at 101–102, 106–107.) The Bankruptcy Court rejected the argument that forgiveness of the loans

---

**3.** The Bankruptcy Court noted that the resulting losses "may be thought of as caused by the lack of care in connection with the extension of the trade credit itself, or in failing to comply with requirements for recovery under the Trade Credit Insurance Policy[,] [b]ut the way they are denominated does not matter . . . ." (PF 25 n. 108.)

**4.** The Bankruptcy Court's decision to use the high end of the K & L range was based in part on its finding that the Officers did not breach the duty of care in overlooking the fact that certain American Tissue subsidiaries were not Approved Debtors under the Policy,

which was one ground on which Kemper denied coverage. (PF 105–106.) Because the Bankruptcy Court found that the Officers did not breach their duty in this respect, it considered it "inappropriate" to consider the incremental potential for loss stemming from this oversight. (*Id.* at 106.) The Bankruptcy Court estimated the "the additional damages resulting from the Approved Debtors Defense to range from $2.53 million to $4.36 million, with the Court fixing them at a single number, if it had to, at $3.71 million—corresponding to an 85% probability of a loss . . . ." (*Id.* at 105.)

was justified by services rendered by the Officers, finding instead that the loan forgiveness was entirely gratuitous. (*Id.* at 101.) In addition to violating the duties of care and loyalty, the Bankruptcy Court found that the forgiven loans constituted constructive fraudulent transfers because the Debtor was insolvent at the time they were made and because the Debtor did not receive reasonably equivalent value in exchange. (*Id.* at 102; *see* Bankruptcy Code §§ 544, 548, 550; N.Y. Debt. & Cred. Law §§ 273, 278). The Bankruptcy Court fixed the damages associated with the forgiven loans at the amounts forgiven: $299,800 for the loan to Koplik and $100,000 for the loan to Siegel. (PF 103.)[5]

Finally, the Bankruptcy Court found that Koplik violated his duties of care and loyalty to the Debtor by authorizing extensions of credit to Liberty Umbrella, a company controlled by Koplik's family member that, the Bankruptcy Court found, did not provide any meaningful benefit to the Debtor. (*Id.* at 100.) The Bankruptcy Court fixed these damages at $52,494, the amount the Trustee was unable to recover from Liberty Umbrella. (*Id.* at 103.)[6]

## DISCUSSION

### I. Standard Of Review

■ "The manner in which a bankruptcy judge may act on a referred matter depends on the type of proceeding involved." *Stern v. Marshall,* — U.S. —, 131 S.Ct. 2594, 2603, 180 L.Ed.2d 475 (2011). A bankruptcy court may enter final judgment in a core proceeding referred to it, subject to review by the district court. 28 U.S.C. § 157(b). Where a proceeding is not a core proceeding, but is "otherwise related to a case under title 11," and the parties have not consented to entry of final judgment by the bankruptcy court, the bankruptcy court "shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1); *see also* Rule 9033(d), Fed. R. Bankr.P. ("The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.").

Here, the Bankruptcy Court expressed the view that, while the "great bulk of the claims asserted here are for breach of fiduciary duty under state law and are non-core" (PF 3 n. 6), "the fraudulent transfer claims asserted here are within [the Bankruptcy Court's] power constitutionally to enter final judgment" (*id.* at 4 n. 7). Accordingly, the Bankruptcy Court denominated its factual recitals as "findings of fact with respect to the fraudulent transfer claims, and ... *proposed* findings of fact with respect to the remainder of the claims." (*Id.* at 5 n. 8 (emphasis original).) Acknowledging, however, that there are differing views on this point, and also that a "fraudulent transfer judgment would be for the same loss covered by its proposed judgment on duty of loyalty claims," the Bankruptcy Court determined that "the

---

5. The Bankruptcy Court determined that Koplik was jointly and severally liable for the loan to Siegel because Koplik approved the forgiveness of Siegel's loan in addition to his own. (PF 102 n. 327.)

6. The Bankruptcy Court discussed transactions in addition to those discussed herein. Because the Bankruptcy Court did not find the Officers to be liable in connection with those transactions, and because no party has raised an objection to those findings, the Court need not address them.

best course ... is for this Court ... to defer entry of the judgment it is empowered to enter on the fraudulent transfer claims pending determination of the remainder of the case by the district court ...." (*Id.* at 4 n. 7.) The Court need not resolve the issue because, whether the fraudulent transfer claims are reviewed on a deferential basis or *de novo,* the outcome would be the same.

## II. *The Officers' Fiduciary Duties*

The bulk of the parties' objections relate to the Trustee's claims for breach of fiduciary duty. New York law governs the Officers' fiduciary duties to the Debtor, a New York corporation. *See Hart v. Gen. Motors Corp.,* 129 A.D.2d 179, 182–83, 517 N.Y.S.2d 490 (1st Dep't 1987). Under New York law, "[t]he elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Rut v. Young Adult Inst., Inc.,* 74 A.D.3d 776, 777, 901 N.Y.S.2d 715 (2d Dep't 2010) (citation omitted). The Officers do not dispute that, as officers and directors, they owed duties of care and loyalty to the Debtor, *see Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264 (2d Cir.1984) (applying New York law), but they do dispute that they breached their duties and that the alleged breaches caused the Debtor harm.

"The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances." *Norlin,* 744 F.2d at 264. The duty of care is subject, however, to the business judgment rule, which "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach v. Bennett,* 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979). As codified, *see Lindner Fund, Inc. v. Waldbaum, Inc.,* 82 N.Y.2d 219, 224, 604 N.Y.S.2d 32, 624 N.E.2d 160 (1993), New York's business judgment rule requires that an officer or director "shall perform his duties ... in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Bus. Corp. Law §§ 715(h), 717(a).

The duty of loyalty "derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *Norlin,* 744 F.2d at 264. In addition to the statutory requirement that officers and directors act in good faith, N.Y. Bus. Corp. Law §§ 715(h), 717(a), the duty of loyalty dictates that "[t]hey may not assume and engage in the promotion of personal interests which are incompatible with the superior interests of their corporation." *Foley v. D'Agostino,* 21 A.D.2d 60, 66, 248 N.Y.S.2d 121 (1st Dep't 1964). "It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply." *In re Croton River Club. Inc.,* 52 F.3d 41, 44 (2d Cir.1995) (applying New York law). "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders." *Norlin,* 744 F.2d at 264; *see also Croton,* 52 F.3d at 44 ("[I]if the business judgment rule does not protect a board's decision, then the burden falls upon the board to demonstrate that its actions were reasonable and/or fair."). Thus, "directors who approve their own

compensation bear the burden of proving that the transaction was fair to the corporation." *Marx v. Akers,* 88 N.Y.2d 189, 204, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (1996) (citations omitted).

These legal precepts guide the Court's review of the parties' objections.

## III. *The Trustee's Objections*

The Trustee raises three objections to the Proposed Findings. First, the Trustee objects to the Bankruptcy Court's finding that the Officers did not breach their duty of care with respect to the trade credit the Debtor extended to American Tissue in excess of the effective coverage under the Policy. Second, the Trustee objects to the Bankruptcy Court's finding that the Officers did not breach their duty of care with respect to the trade credit the Debtor extended to certain American Tissue subsidiaries not listed as Approved Debtors under the Policy. Third, the Trustee objects to the Bankruptcy Court's findings that the Trustee failed to prove causation with respect to the non-trade loans the Debtor made to American Tissue. For reasons explained, each of the three objections is overruled.

Because it informs much of the discussion, the Court begins with the significance of the American Tissue fraud.

### a. *American Tissue Fraud*

The Trustee objects to the Bankruptcy Court's finding that the American Tissue fraud broke the casual chain between the Officers' breach of duty and the Debtor's loss with respect to more than $8 million in non-trade loans to American Tissue. According to the Trustee, the Officers should have foreseen the fraud in light of a number of "red flags," including American Tissue's requests for loans for payroll and other uses, the re-aging of receivables, delivery of post-dated and bounced checks, disputed invoices, and delinquent payments. As explained below, the Court agrees with the Bankruptcy Court that the Trustee failed to prove cause-in-fact, as required to recover damages for breach of fiduciary duty.[7]

In addressing factual causation, the Court is faced with the hypothetical question, what would have happened had the Officers been more careful? *See generally RSL Commc'ns PLC v. Bildirici,* 649 F.Supp.2d 184, 208 (S.D.N.Y.2009) (holding, as to the "threshold question" of factual causation, that "Plaintiff has failed to adduce sufficient evidence that Defendants' alleged breaches of fiduciary duty were a factual, 'but for' cause of the losses for which Plaintiff seeks damages"), *aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher,* 412 Fed.Appx. 337 (2d Cir.2011) (summary order). In that regard, the record contains significant circumstantial evidence pointing to the conclusion that closer scrutiny of American Tissue's financial statements would not have led the Officers to conclude that American Tissue was not credit worthy; certainly there is no evidence that they would have uncovered the fraud.

As a threshold matter, the Court, upon its own review, agrees with the Bankruptcy Court's proposed finding, unchallenged by the Trustee, that "American Tissue's financial statements had been falsified, inflating American Tissue's revenues, improperly capitalizing expenses and assets, and otherwise overstating revenues and

---

7. Because the Court concludes that the Trustee failed to prove factual causation, there is no need to address whether the American Tissue fraud constituted a superseding cause, which, under New York law, is a question of proximate causation. *See Kush v. City of Buffalo,* 59 N.Y.2d 26, 32–33, 462 N.Y.S.2d 831, 449 N.E.2d 725 (1983); *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 314, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980).

assets." (PF 96; see Defs.' Exs. 1, 2, 3; Fisch Report 6.) Both Koplik and Siegel testified that they were unaware of the fraud at the time the Debtor extended credit to American Tissue and there is no evidence to the contrary. (Koplik Supp. Trial Aff. ¶ 23; Siegel Supp. Trial Aff. ¶ 128.)

Because of the fraud, American Tissue appeared to the world to be a much healthier company than it was. An April 13, 2002, draft report prepared by RSI (the "RSI Draft Report"), and introduced by the Trustee at trial, noted the following:

Arthur Anderson, ATC's outside auditors, issued unqualified opinions on ATC'S September 30, 1999 and September 30, 2000 financial statements. In addition, quarterly financial reports filed with the Securities and Exchange Commission ("SEC") through March 31, 2001 did not indicate that there were any imminent problems at ATC that could result in a collapse of its business.

(Pl.'s Ex. 14 at 25.) American Tissue's Form 10–K for fiscal year 2000, for example, showed a profit of $24.5 million for the year, assets valued at more than $500 million, and stockholder equity of almost $123 million. (Fisch Report 4.)

The Officers claim to have relied on publicly available information about American Tissue. The Officers read American Tissue's financial statements. PF at 22 (citing 5/14/08 Tr. 188.) Siegel testified that he reviewed American Tissue's Form 10–Qs filed with the SEC, which indicated EBITDA in excess of $55 million, as well as the pro forma information included in American Tissue's offering memorandum for the proposed 2001 bond offering, which indicated that EBITDA would be $154 with recent acquisitions. (Siegel Supp. Trial Aff. ¶ 127.) Both Officers claim to have relied in part on the proposed offering. (Siegel Supp. Tr. Aff. ¶ 118; Koplik

Supp. Tr. Aff. ¶ 20.) Koplik testified that he "saw an executed 'highly confident letter' written by UBS Warburg to ATC, expressing confidence in the closing of the proposed $400 million offering" by American Tissue (Koplik Supp. Trial Aff. ¶ 20), although the testimony of a former UBS employee cast doubt on whether a final version of the letter was in fact executed. (Flicker Trial Aff. ¶ 2.) Regardless, there is no evidence that UBS uncovered the fraud. Nor did the Trustee's expert offer any opinion as to the ability of a reasonably prudent person in either Officer's position to uncover it. (Guth Aff. ¶¶ 5–16.) Under these circumstances, especially considering the failure of several other sophisticated entities to uncover the fraud, the Court cannot find that the Officers' failure to more carefully examine American Tissue's financial statements caused the Debtor's loss.

The Trustee next points to a number of purported red flags—warnings uniquely available to the Officers—that he argues should have alerted the Officers to the American Tissue fraud. These mainly consist of signs that American Tissue was short on cash. For example, the Debtor assisted American Tissue in financing multiple acquisitions of other paper companies and agreed to re-age certain of its receivables. (PTO ¶¶ 5.32, 5.33, 5.34, 5.35, 5.138.) The Debtor also arranged for a third party to help American Tissue make a bond payment. (*Id.* ¶ 5.36.) And, notably, American Tissue bounced over $3 million in checks issued to the Debtor in June 2001. (*Id.* ¶ 5.47.) Both Koplik and Siegel admitted that they were aware that American Tissue was short of working capital in early 2001. (5/15/08 Tr. 21; 7/16/08 Tr. 28.)

Even with these indications that American Tissue was short on cash, the Trustee has not proven that the Officers should

have, through the exercise of reasonable care, discovered the fraud. As the Bankruptcy Court noted, "[w]hile fraud is a possible explanation for financials showing profits while bouncing checks and making late payments, and having a lack of liquidity, it is not the only explanation." (PF 51.) Siegel testified that increasing energy and labor costs, as well as environmental concerns, had made it increasingly difficult to operate pulp and paper mills in the United States and that, as a result, "[t]he pulp and paper industry in 2000/2001 in North America was characterized by a series of consolidations and shutdowns of mills." (Siegel Supp. Trial Aff. ¶ 7.) In this context, American Tissue adopted the strategy of acquiring under-performing paper companies and integrating them into its existing business. (PL's Ex. 14 at 24.) Koplik testified that he knew that American Tissue was "cash short" but that he understood American Tissue's cash shortage to result from its "very rapid" acquisition of other paper companies "at very attractive prices," as well as the nature of American Tissue's business, which required that it carry "huge inventories." (5/15/08 Tr. 146, 148.) Similarly, Siegel testified that, as he understood it, American Tissue's "continuing purchase and operation of new facilities were requiring all the use of their cash" but that, despite this illiquidity, American Tissue was "exceedingly profitable." (7/16/08 Tr. 143, 144.) Thus, defendants contend that American Tissue's lack of cash was not a red flag indicating economic distress, much less financial fraud, but merely a symptom of American Tissue's growth strategy—or so the Officers reasonable believed at the time. The Officers' explanation may seem wrong in hindsight, but there is little basis for the Court to find that American Tis-

sue's lack of cash should have alerted the Officers to the fact that American Tissue was fraudulently inflating revenues and assets when its rapid acquisition of smaller paper operations presented a plausible alternative explanation. (See 5/14/08 Tr. 20 (expert testimony that "the evidence that Koplik had of American Tissue's lack of liquidity was not inconsistent with the financial statements and didn't undermine their reliability").)

▇▇ In summary, the Court finds that the Trustee did not carry his burden to prove that, but for the Officers' failure to more closely analyze American Tissue's financial statements, the Debtor would not have extended credit to American Tissue. Furthermore, the Trustee did not prove that the Officers breached the duty of care in failing to discover the American Tissue fraud.

b. *Trade Credit To American Tissue*

The Trustee objects to the Bankruptcy Court's finding that "the Trustee failed to meet his burden to show failures of the duty of care with respect to the $7.25 million in trade credit that exceeded the coverage under the Trade Credit Insurance Policy." (PF 98 (footnote omitted).) More specifically, the Trustee objects to the Bankruptcy Court's finding that the Officers did not breach their duty with respect to the $4 million in trade credit that exceeded the nominal $15 million limit of the Policy as well as the $3.25 million shortfall in coverage that resulted from the fact that the Policy only covered 85% of losses and was subject to a $1 million deductible. (*Id.* at 25 & n. 107.)[8]

The Bankruptcy Court reasoned that "[t]he combination of the due diligence

---

8. The Bankruptcy Court variously stated the outstanding trade credit to American Tissue as "approximately $18 million" (PF 9, 11, 93)

or "approximately $19.3 million" (*id.* at 21). The apparent discrepancy is immaterial in view of the Court's holding.

that was undertaken and the Trade Credit Insurance Policy—assuming compliance with the Trade Credit Insurance Policy requirements—would bring the risk associated with the incremental $7.25 million in trade credit down to a level where profit making opportunities could trump the risk." (*Id.* at 25.) The Trustee argues that the Bankruptcy Court erred when it found that the Officers conducted due diligence in connection with the trade credit extended to American Tissue and erred in finding that the risk was justified by the opportunity to make a profit. The Trustee also argues that it was a breach of duty for the Officers to fail to obtain a full $15 million in effective insurance coverage. Each prong of the Trustee's objection fails.

The Trustee did not prove that the Officers failed to conduct a reasonable inquiry into American Tissue's business before extending trade credit. The Bankruptcy Court properly found that the Officers did in fact undertake due diligence in connection with the extension of trade credit to American Tissue, albeit in an informal way. The Bankruptcy Court noted that "Koplik and Kelly both read American Tissue's financial statements." (*Id.* at 22 (citing 5/14/08 Tr. 188).) Furthermore:

> Koplik also had dinner with Gabayzadeh (whom Koplik had known for approximately 10 years) approximately once a week to discuss American Tissue's business. And Koplik also had a close relationship with Stein, going back 22 years. Koplik trusted Stein, who had become CFO of American Tissue with Koplik's consent. Thus, Koplik and Siegel were being regularly briefed on the status of American Tissue by two close colleagues, and the Court accepts Koplik's and Siegel's testimony that they trusted Gabayzadeh and Stein.

(*Id.* (citing 5/15/08 Tr. 125–127, 152).) That said, the Bankruptcy Court also rightly found that the Officers deliberations with respect to transactions with American Tissue amounted merely to informal, " 'back of the envelope' analysis." (*Id.* at 24.) Indeed, there were no documents in the Debtor's files evidencing any written credit evaluations with respect to American Tissue. (*Id.* (citing Kasoff Aff. ¶ 22).) While the Officers' decision-making process may not have been documented with contemporaneous memoranda, it need not have been. It was based on the Officers' review of American Tissue's financial statements and communications with two of its senior executives.

The evidence showed that providing American Tissue with access to credit presented a business opportunity to the Debtor's core paper business. The Officers testified that their motivation for extending significant credit to American Tissue was to profit from American Tissue's growth and expansion as it acquired smaller paper companies. (*See, e.g.,* Siegel Supp. Trial Aff. ¶¶ 33–52; Koplik Supp. Trial Aff. ¶¶ 6–9.) In pursuit of that strategy, "the Debtor began in the second quarter of 2001 to increase its business with ATC." (Siegel Supp. Trial Aff. ¶ 36.) Koplik stated that "the Debtor's increasing reliance upon ATC as a customer evolved from consolidation in the Debtor's industry" and that, from his perspective, "it was crucial for the Debtor to assist ATC in order to protect its own market share." (Koplik Supp. Trial Aff. ¶ 6.) In other words, "[t]o grow its business, the Debtor had little choice but to do business with ATC." (*Id.*) Further, as to non-trade advances, Siegel testified that, in addition to the promise of repayment, American Tissue "agreed that the Debtor would be its preferred supplier of pulp and waste paper to several of its newly-acquired mills." (Siegel Supp. Trial Aff. ¶ 37; *see* PTO ¶¶ 5.33, 5.34.) Thus, through the extension

of credit to American Tissue, the Officers sought to develop and strengthen the Debtor's business relationship with an important customer. The Court finds that the decision to extend trade credit to American Tissue was a business judgment undertaken in good faith and for a legitimate business purpose.

Moreover, though the facts known to the Officers (e.g. bounced checks, difficulty making payroll) could fairly be taken as signs of trouble, American Tissue had paid its debts in the past. In January 2001, for example, the Debtor advanced American Tissue over $2 million in working capital loans, all of which was repaid, as was a $1.7 million loan made in March 2001. (PTO ¶ 5.45.) Indeed, Kelly testified that "[w]hile accounts receivable from ATC were at times difficult to collect," as of January 2001, the Debtor "had never written off any material ATC account receivable." (Defs.' Kelly Aff. ¶¶ 4, 5.) This included the extension of approximately $24 million in credit to American Tissue in 1999, which American Tissue repaid following its successful 1999 bond offering. (PTO ¶ 5.116; Fisch Report 6.) As noted, American Tissue had engaged UBS Securities in connection with an additional $400 million planned bond offering in mid–2001. (PTO ¶ 5.50.) Unaware of the American Tissue fraud, Kelly testified that he never believed that American Tissue's accounts receivable would become uncollectible. (Defs.' Kelly Aff. ¶ 8.) In short, the Trustee has not rebutted the Officers' expert testimony that, "[e]ven if ATC was illiquid, if it truly had possessed over $500 million worth of assets, liquidation of those assets would have enabled it to pay [the Debtor] in full." (Fisch Report 6.)

Finally, the Trustee also failed to prove that the Officers' failure to secure a full $15 million in effective insurance coverage constituted a breach of duty. It is undisputed that Fleet agreed to increase the Debtor's credit line to $15 million based in part on the Debtor's agreement to obtain trade credit insurance in that amount. (PTO ¶¶ 5.15, 5.113.) But it appears that Fleet did not view as a default under the Revolver the Debtor's obtaining a $15 million policy with a potential payment of less than $15 million because of the $1 million deductible and 85% coverage percentage. The Forbearance Agreement, which recites a number of the Debtor's defaults under the Revolver, does not identify the coverage shortfall as a default. (Pl.'s Ex. 7 § 2.4(c).) Nor does the Trustee cite any provision of the Revolver requiring an insurance policy with a full $15 million in coverage. Indeed, the Trustee's counsel conceded at oral argument that the Policy's coverage ran "parallel" to the Revolver, which "only has advances for 85 percent of the eligible accounts." (7/23/13 Tr. 5–6.) Other than compliance with the Revolver, the Trustee offers no other reason why obtaining such coverage was necessary for the Officers to satisfy their duty of care.

### c. *Approved Debtors Defense*

The Bankruptcy Court found that the Trustee had not proven that the Officers breached their fiduciary duties with respect to the "Approved Debtors Defense" invoked by Kemper in denying coverage under the Policy. The Approved Debtors Defense (as it was dubbed by K & L) refers to Kemper's position that coverage under the Policy only included trade credit to American Tissue and certain subsidiaries enumerated in the Policy. As noted above, the Debtor and Kemper did not litigate the Approved Debtors Defense, instead settling the dispute for a fraction of the Debtor's total insurance claim.

The Bankruptcy Court found that the Trustee had not carried his burden to

prove that the Officers breached their duty of care in connection with the Approved Debtors Defense:

If the Officers had taken the time to understand policy details—as contrasted to the basics of what the Trade Credit Insurance Policy said—they might have noticed that the policy covered only American Tissue and certain named American Tissue affiliates (and that others generating receivables were not on the list), but it is not clear to the Court that even more careful executives would have picked this up. The deficiency that would have led to this loss—selling to American Tissue Affiliates that were not listed on the policy—is not at all as obvious or egregious as reaging receivables, or failing ... to familiarize oneself with the requirements of the policy. The Court cannot find the Officers' overlooking the fact that some American Tissue subsidiaries were not listed to be sufficiently negligent to constitute an actionable breach of the duty of care.

(PF 35–36.) In objecting to this finding, the Trustee contends that the Officers' knowledge of the Policy was inadequate, that Koplik improperly abdicated his responsibility to Kelly and Siegel, and that the Officers failed to ensure that all of American Tissue's subsidiaries were covered under the Policy. The Court rejects these contentions.

 The Policy was obtained by the Debtor's insurance broker, J.A. Lorenzo & Co. Ltd. ("J.A.Lorenzo"), through Trade Underwriter's Agency ("TUA"), an agent for several insurance companies. (Pl.'s Ex. 35 at RE–500 68.) In July 1999, J.A. Lorenzo expressed to TUA the Debtor's request that the endorsement read "American Tissue Holdings, Inc., its Affiliates and Subsidiaries," but, days later, J.A. Lorenzo nonetheless sent TUA an outdated list of subsidiaries based on a 1998 American Tissue financial statement that did not include later-acquired subsidiaries. (*Id.* at RE–500 67.) Although the endorsement identifying the Approved Debtors was "revised and reissued numerous times in 1999, 2000 and 2001" (*id.* at RE–500 86), it was not until August 22, 2001, that J.A. Lorenzo requested that the omitted subsidiaries be added as Approved Debtors under the Policy. (*Id.*)

These facts indicate a failure by the Debtor's agent, J.A. Lorenzo, to properly carry out the Debtor's request for insurance coverage for all American Tissue subsidiaries. Though the Trustee asserts that the Officers were aware of this failing, he does not identify any evidence in the record showing that the Officers, as opposed to J.A. Lorenzo, were alerted to the omission of certain American Tissue subsidiaries from the endorsement. As the Bankruptcy Court noted, the omission of certain recently acquired subsidiaries from the Policy was not particularly obvious. A schedule to the Policy lists the specific credit limits for a number of customers, including the following customers associated with American Tissue: American Tissue Mills Greenwich, American Tissue Corp., American Tissue Mills of Neenah LLC, American Tissue–New Hampshire, American Tissue Mills of N.Y., American Tissue Mexico c/o American Tissue Corp., and American Tissue Mills of Oregon. (*Id.* at RE–500 69.) In this context, the omission of three subsidiaries-Pulp and Paper of America (Berlin/Gorham), American Paper Mills of Vermont, and American Tissue Corporation of Tennessee-is not particularly glaring and would not have been apparent except to someone intimately familiar with American Tissue's holdings. (*Id.* at RE–500 69–70.)

Based on the record as a whole, the Court agrees with the Bankruptcy Court that the Trustee failed to carry his burden

of proving a breach of duty with respect to the Approved Debtors Defense.

## IV. *The Officers' Objections*

The Officers raise ten objections to the Proposed Findings. These can be grouped into three categories: (1) objections relating to the Policy; (2) objections relating to the Revolver and the Forbearance Agreement; and (3) objections relating to loan forgiveness. For reasons explained, all of the Officers' objections are overruled.

### a. *The Policy*

The Officers' first four objections attack the Bankruptcy Court's award of damages with respect to the Policy. The Officers argue that they properly delegated responsibility for ensuring compliance with the Policy to Kelly and that the Officers did not breach the duty of care in connection with any of the coverage defenses invoked by Kemper. These contentions are considered and rejected below.

#### i. *Delegation Of Responsibility To Kelly*

The Officers' first objection is that the Bankruptcy Court erred in finding that the Officers' purported delegation of responsibility for complying with the Policy to Kelly, the Debtor's VP of Finance and CFO, was improper. Because the Court does not find that Kelly's corporate responsibilities included ensuring compliance with the Policy, it concludes that the objection is without merit.

Koplik made no pretense of familiarity with the Policy, admitting that he had never read it and had done nothing to familiarize himself with it, "[o]ther than in the most general terms." (Koplik Dep. 113, 114.) He had no knowledge of the Policy's coverage or conditions. (*Id.* at 114–124.) He testified that, following the departure of Stein, who obtained the Policy, Kelly was responsible for maintaining it. (*Id.* at 110.) Koplik never discussed the Policy's restrictions with Kelly. (*Id.* at 111.) When asked if he did anything to ensure compliance with the Policy, Koplik stated that he "relied on Mr. Kelly and Mr. Siegel to do that." (*Id.* at 113.) But Koplik did not recall asking Kelly to ensure compliance with the Policy, stating, "I would believe that Mr. Siegel asked him." (*Id.* at 112, 113; *see also id.* at 165 (Koplik had no recollection of asking anyone to ensure re-aging of receivables complied with Policy).)

Siegel demonstrated some familiarity with the Policy, although he may have misunderstood its terms. (Siegel Dep. 80–95; *see* PF 29.) Siegel did not explicitly claim that he relied on Kelly to ensure compliance with the Policy, although he stated that the Debtor's chief financial officer, i.e., Kelly, would have "prime responsibility" for ensuring compliance with the Revolver, which Siegel may have meant to include the Policy obtained in connection with the Revolver. (Siegel Dep. 22.)

For his part, Kelly testified that his duties "included maintaining the existing written credit policy for the Company" as well as "maintain[ing] credit files on each of the Debtor's customers," including American Tissue. (Defs.' Kelly Aff. ¶¶ 2, 3.) Another of his "job functions at the [the Debtor] was to collect accounts receivable from 1999 through 2002." (Pl.'s Kelly Aff. ¶ 6.) He reported directly to Siegel. (*Id.* ¶ 3.) Kelly did not testify that his responsibilities included monitoring compliance with Policy.

Aside from Koplik's assertion that he relied on Kelly, and Siegel's somewhat ambiguous statement to the same effect, the only testimony that Kelly was responsible for ensuring compliance with the Policy came from Barry Kasoff, the principal and President of RSI, who was retained by the Debtor after the events at issue took place. Kasoff, as the Trustee's witness, testified

that "Michael Kelly, who reported directly to Siegel, was responsible for compliance with the Trade Credit Insurance Policy." (Kasoff Trial Aff. ¶¶ 1, 20.) Kasoff did not state the basis for this belief.

There is also some documentary evidence indicating that Kelly dealt with the Policy. On April 25, 2001, Vernon Proll of J.A. Lorenzo, the Debtor's insurance agent, faxed Kelly to inform him that "Trade Underwriters is in agreement with the arrangement for 60 day open account sales presented to the bank of the 90th day for payment, to be treated for premium calculation purposes as 60 day O/A sales." (Defs.' Ex. 24.) In other words, the Debtor's insurance agent communicated with Kelly regarding the re-aging of American Tissue receivables. Kelly was also the person who, by letter dated September 21, 2001, transmitted to TUA the Debtor's claim under the Policy, copying J.A. Lorenzo and Siegel. (Pl.'s Ex. 49.) Finally, the record contains a letter from Kelly to Proll, dated October 15, 2001, enclosing American Tissue's account balances and cash receipts, which Kelly asked be forwarded to TUA. (Pl.'s Exs. 48, 56.) On the other hand, it was Siegel, not Kelly, who, by fax to Kemper dated November 2, 2001, set forth the Debtor's initial position on a number of coverage issues that had arisen after the Debtor submitted its claim, such as the omission of certain American Tissue subsidiaries from the Policy and the re-aging of receivables (Defs.' Ex. 26), and it was also Siegel to whom the Denial Letter was addressed (Pl.'s Ex. 33A).

The Officers argue that their purported reliance on Kelly was reasonable. They note, for instance, that Kelly did inform the Officers that the extension of non-trade credit to American Tissue violated the terms of the Revolver, although they did not heed that warning. (Pl.'s Kelly Aff. ¶ 7.) Though Kelly knew that the Officers had proposed to re-age certain American Tissue receivables (id. ¶ 8), there is no indication that he advised the Officers that this would violate the conditions for recovery under the Policy. The Officers contend that this failure does not constitute a breach of duty on their part. In response, the Trustee notes that both Officers were authorized to make the decisions at issue (PTO ¶ 5.74) and that it was the actions of the Officers, not Kelly, that caused harm to the Debtor. To the extent the Officers relied on Kelly to ensure compliance with the Policy's terms, the Trustee characterizes this reliance as an abdication of responsibility.

■ The Bankruptcy Court found that while delegation to Kelly could have been an acceptable arrangement, the Officers "never took steps to ensure that there was compliance, and, importantly, to coordinate operational decisions, made by Koplik and Siegel, with basic requirements for recovery under the policy." (PF 30.) This Court agrees. Although Kasoff, an outside consultant brought in after the events at issue took place, testified that Kelly was responsible for overseeing compliance with the Policy, Kelly himself did not claim such responsibility in either of his two affidavits. Moreover, Koplik, who claims to have relied on Kelly, never consulted him about the Policy and never asked him to ensure compliance. And there is no clear statement from Siegel, to whom Kelly reported, that Siegel relied on Kelly or assigned Kelly responsibility for compliance with the Policy. Standing alone, the fact that Kelly communicated with J.A. Lorenzo and TUA about the Policy on a few occasions does not establish his responsibility for ensuring that actions taken by the Officers did not violate the Policy's terms. As officers and directors of the Debtor, authorized to undertake the trans-

actions at issue, the Officers were obligated, before embarking on a course of conduct potentially exposing the Debtor to significant risk, to ask whether such actions complied with the Policy, or, if they were unsure, to seek counsel from other officers or employees of the Debtor, such as Kelly, or from outside advisors. There is no evidence that the Officers made any effort to determine whether their actions would affect the Debtor's ability to recover under the Policy. Nor is there evidence that Kelly gave them false information in that regard.[9] In short, while delegation was an option available to the Officers in overseeing the Policy, the Court does not find that the Officers, the Debtor's two most senior executives and only active members of the Board, put Kelly, or anyone else, in a position of responsibility and authority to ensure compliance with respect to the Policy.

### ii. *Overdue Debtor Endorsement*

The Officers' second objection is that Kemper's denial of coverage, and specifically its invocation of the Overdue Debtor Endorsement, was not the result of any breach of duty by the Officers.

The Policy covers only losses arising from a Qualifying Default, which in turn must derive from a Qualifying Sale. (Pl.'s Ex. 9, Definitions.) The Overdue Debtor Endorsement excludes from the definition of Qualifying Sale "[s]ales to an Approved Debtor when *any* payment by the Approved Debtor to the Insured is two months or more overdue." (Pl's Ex. 9, Overdue Debtor Endorsement (emphasis added).) Thus, the Overdue Debtor Endorsement excludes coverage for any loss deriving from a sale to a customer who had any payment overdue by two or more months at the time of the sale.[10]

Kemper cited the Overdue Debtor Endorsement as its first ground for disclaiming coverage. In the Denial Letter, Kemper stated that "prior to the earliest invoice included in the claim, American Tissue already had invoices that were more than two months overdue" and therefore "no coverage applied to any sales made to American Tissue, for the period January 1, 2001 (policy inception date) until February 7, 2001 and again for at least the period of March 10, 2001 until May 3, 2001." (Pl.'s Ex. 33A at 2.) Indeed, Kemper stated, "it appears likely that many if not most and perhaps even all of the invoices listed in the claim would be excluded from coverage for the very same reason...." (*Id.*) As a result, Kemper concluded that "the loss not excluded by this reason does not exceed the applicable deductible." (*Id.*)

The Officers argue that the Debtor's difficulty in recovering under the Policy can be attributed to the Overdue Debtor Endorsement alone and that the endorsement was implicated not as a result of the Officers' breach of duty but due to American Tissue's failure to pay its bills on time.

---

**9.** The Officers' reliance on New York's Business Corporation law is misplaced. Under New York law, officers and directors "shall be entitled to rely on information, opinions, reports or statements ... prepared or presented by ... one or more other officers or employees of the corporation ... whom the officer believes to be reliable and competent in the matters presented...." N.Y. Bus. Corp. Law §§ 715(h), 717(a). The Officers do not put forward any information, opinions, or other statements from Kelly on which they purportedly relied.

**10.** The Bankruptcy Court appears to have construed the Overdue Debtor Endorsement to mean that "the policy excluded coverage for *payments* that were two months or more overdue ...." (PF 27 (emphasis added).) By its terms, however, the exclusion appears to apply to sales to overdue customers, not overdue payments.

The argument fails for at least two reasons.

 First, the Overdue Debtor Endorsement, although it may have applied to all of the relevant sales to American Tissue, did not provide Kemper with an ironclad coverage defense. In analyzing the Overdue Debtor Endorsement, K & L noted that the language was ambiguous as it relates to pre-Policy invoices and that the Debtor could have argued, among other things, that Kemper had waived the endorsement's application or was estopped from invoking it. (PL's Ex. 35 at RE–500 74–82.) K & L estimated that "the most favorable reading of this endorsement would result in a reduction of approximately $2.5 million" in the Debtor's claim, while a less favorable reading could reduce the Debtor's claim by as much as $8.7 million. (*Id.* at RE–500 66.) While a reduction on the high end of that spectrum would have wiped out a substantial portion of the Debtor's claim, the range was wide and the outcome in the event of litigation uncertain.

Second, there is no indication that the Officers heeded the terms of the Overdue Debtor Endorsement. As noted above, the Officers, especially Koplik, demonstrated only cursory familiarity with the Policy's terms. (Koplik Dep. 111–124, 165; Siegel Dep. 80–95.) Koplik specifically testified that he was unaware of the Overdue Debtor Endorsement. (Koplik Dep. 115–16.) Had the Officers understood the Overdue Debtor Endorsement, they might have taken steps to ensure a substantial recovery under the Policy, such as requiring that American Tissue bring its past payments up to date and pay all future invoices within two months of becoming due. Because the Officers did not know of

the Policy's terms, it cannot be said that their decision not to take such action was a business judgment.[11]

### iii. *Cooperation Covenant*

The Officers' third objection relates to the Policy's Cooperation Covenant, on which Kemper relied in denying coverage. The provision describes the specific steps the insured is to take if faced with a "potential Qualifying Default situation," stating in relevant part as follows:

> The Insured will take all reasonable steps to avoid or minimize Loss. Should a potential Qualifying Default situation arise, such steps shall include making at least one written demand for payment upon the Approved Debtor and any of its guarantors at least one month prior to the filing of a standard proof-of-loss form and, where prudent, ceasing further deliveries or granting of credit to the Approved Debtor. . . . The Insured will pursue all reasonable legal, administrative, judicial, and informal means of avoiding or remedying any event of Loss which is a Qualifying Default or potential Qualifying Default. The Insured will cooperate fully . . . with the Insurer in the investigation and resolution of any Qualifying Default or potential Qualifying Default situation and the pursuit of any salvage. Such cooperation will include disclosure of records and documents and the making available of witnesses. The Insured will not enter into any agreement concerning a Qualifying Default or potential Qualifying Default without the Insurer's prior written consent, including any agreement providing for the rescheduling of payment of the debt.

11. This holds true regardless of whether, as the Officers contend, the Overdue Debtor Endorsement was an "exclusion" from coverage, as opposed to a requirement for coverage, such as those found in the Policy's covenants.

(Pl.'s Ex. 9, Representations and Covenants, Cooperation.) Kemper invoked both the requirement that the Debtor take steps to avoid or minimize loss and the prohibition on rescheduling of a covered debt without the insurer's prior written consent. (Pl.'s Ex. 33A.) The Bankruptcy Court found that the Officers breached the duty of care in failing to secure Kemper's prior written consent to the re-aging of American Tissue receivables. (PF 31.) It also noted that Kemper had invoked the requirement that the Debtor minimize loss, although the Bankruptcy Court did not specifically find that the Officers had failed to do so. (*Id.* at 32.) The Officers object to the Bankruptcy Court's treatment of both issues.

### 1. *Re-aging Of Receivables*

In March 2001, at American Tissue's request, the Debtor re-aged nearly $5 million in receivables from 60–day to 90–day terms from the date of shipment. (PTO ¶ 5.32.) The Denial Letter cites this agreement to "reschedule nearly $5 million of its receivable from American Tissue" as one ground for denying coverage, stating that the rescheduling "was at no time disclosed to either Trade Underwriters Agency or Lumbermens." (Pl.'s Ex. 33A at 3.) The insurer took the position that this violated the provision of the Cooperation Covenant requiring that "[t]he Insured will not enter into any agreement concerning a Qualifying Default or potential Qualifying Default without the Insurer's prior written consent, including any agreement providing for the rescheduling of payment of the debt." (*Id.*)

The K & L Assessment explored the arguments the Debtor could raise in response. Initially, it noted that the re-aging did not cause the American Tissue receivables to exceed the Policy's maximum tenor of 123–day credit terms. (PL's Ex. 35 at RE–500 89.) Further, K & L

expressed the belief that the Debtor had notified Kemper, through its agent, TUA, of the change in credit terms shortly after they were agreed to with American Tissue and that Kemper had later confirmed this arrangement. (*Id.*) Even if this correspondence did not strictly satisfy the Cooperation Clause's requirement of prior consent, K & L reasoned that Kemper should be estopped from invoking the breach under these circumstances. (*Id.*)

The Officers seek to adopt K & L's approach, citing two faxes from Vernon Proll of J.A. Lorenzo, the Debtor's agent, that are in the record. First, in a fax to TUA dated March 9, 2001, Proll states that [t]he insured has requested to increase the limit to $17,000,000 (from the current $12,000,000)." (Defs.' Ex. 23.) Proll also states that "Perry Koplik and ATC have agreed to payment terms of 90 day drafts." (*Id.*) In closing, he notes that "[t]he insured have requested a speedy turnaround on this request," although not specifying whether "this request" was a reference to the request to increase the limit to $17 million, payment terms of 90 days, or both. (*Id.*) Then, in a fax to Kelly dated April 25, 2001, Proll states that "Trade Underwriters is in agreement with the arrangement for 60 day open account sales presented to the bank on the 90th day for payment, to be treated for premium calculation purposes as 60 day O/A sales." (Defs.' Ex. 24.)

■ Although crediting and relying on the K & L Assessment in other respects, the Bankruptcy Court disagreed with K & L's treatment of this issue, finding that the cited correspondence did not satisfy the Policy's pre-approval requirement and that the Officers were not justified in relying on it.

First, it was not obtained prior to the actions for which approval was neces-

sary, as the policy required. Second, the letter, on its face, did not make reference to the condition for recovery, or say that the condition was satisfied or waived; in fact, it referred to an agreement with Trade Underwriters for "premium calculation purposes," which was quite different from an agreement with respect to conditions for recovery. Third, it was executed by the Debtor's agent, not the insurer's; it did not constitute anything in writing executed by the insurer; and to the extent it made reference even to assent by the insurer (or the insurer's agent), was classic hearsay.

(PF 31.) Again, the Court agrees in material respects. Kelly informed Stein at American Tissue on March 5, 2001, that "[t]he remaining receivables as of March 1st of approximately $4,875,000 will be re aged [sic] with 90–day terms...." (PL's Ex. 43.) Thus, there can be no doubt that the Debtor agreed to the re-aging before either the March 9 or the April 25 fax. There is no evidence that either Officer ever saw anything in writing directly from TUA or Kemper agreeing to the re-aging, either before or after March 5, 2001. Further, even if the Debtor might conceivably have prevailed on its estoppel argument, the Officers' failure to get written approval in advance of the re-aging certainly made recovery under the Policy materially more difficult.[12]

### 2. Minimization Of Loss

Kemper also asserted that the Debtor had breached the Cooperation Covenant by failing to take reasonable steps to avoid or minimize loss. Specifically, Kemper took the position that allowing receivables from American Tissue to increase from approximately $5 million to over $18 million was a violation of the Cooperation Covenant, stating that the "nearly quadrupling of the receivable clearly constitutes a failure on [the Debtor's] part to take reasonable steps to avoid or minimize loss." (Pl.'s Ex. 33A at 4.)

While the Officers raise an objection to the Bankruptcy Court's treatment of this issue, it is not apparent what they object to, as the Trustee and the Officers agree that the Bankruptcy Court did not make a specific finding that the Officers breached their duty of care by failing to avoid or minimize loss within the meaning of the Cooperation Covenant. (Defs.' Objs. 47; Pl.'s Resp. 34.) The Bankruptcy Court only referenced the requirement that the Debtor avoid or minimize loss when setting out the conditions for recovery under the Policy (PF 7, 26), describing the Denial Letter (*id.* at 32), and describing the K & L Assessment (*id.* at 36 n. 140). The Bankruptcy Court made no additional findings with respect to the obligation to avoid or minimize loss. Thus, the objection is without merit.[13]

### iv. *Kemper's Reservation Of Rights*

The Officers' fourth objection is that "[t]he Bankruptcy Court wrongly suggested that Kemper's reservation of rights to

---

**12.** In considering the strength of the estoppel argument, it is telling that the Debtor, represented by K & L, ultimately settled for a fraction of its total insurance claim. It also bears repeating that the Bankruptcy Court, in fixing damages, assumed the high end of the K & L range of recovery as the Debtor's imputed recovery in the event of litigation.

**13.** To the extent the Officers object to the Bankruptcy Court's more general finding that the Officers "failed to take reasonable steps to comply with the requirements of the Trade Credit Insurance Policy" (PF 8), the objection is overruled. As has been discussed at length, the Officers engaged in conduct, most notably the re-aging of receivables, that significantly undermined the Debtor's ability to recover under the Policy.

disclaim coverage on other grounds," specifically, the Debtor's failure to disclose material information and failure to adhere to its credit practices, "was evidence of a failure of care by the Officers." (Defs.' Objs. 49.) Again, the objection can be rejected without lengthy discussion because, as is apparent from the wording of the objection itself, the objected-to "suggestion" never appears as a finding in the Proposed Findings. Nowhere in the Proposed Findings does the Bankruptcy Court state that Kemper's reservation of rights evidenced a breach of duty by the Officers. In the footnote cited by the Officers, the Bankruptcy Court simply noted that the K & L Assessment "identified" other defenses from the Denial Letter: "cooperation, adherence to credit practices, failure to minimize loss, reporting requirements, and nondisclosure." (PF 36 & n. 140.)

b. *The Revolver And Forbearance Agreement*

The Officers' fifth, sixth, and seventh objections attack the Bankruptcy Court's award of damages for the Officers' breach of duty in connection with the Revolver, measured as the cost of securing forbearance from Fleet. The Officers do not challenge the Bankruptcy Court's finding that they knowingly violated the terms of the Revolver (PF 43), one of the Debtor's principal sources of financing (PTO ¶ 5.7). The Officers contend, however, that the damages awarded by the Bankruptcy Court were not sought in the Amended Complaint or at trial, do not relate to any harm suffered by the Debtor, and, in any case, are speculative. Each argument is considered and rejected below.

i. *Damages For The Cost Of Forbearance*

For their fifth objection, the Officers argue that, because the Trustee did not assert a separate cause of action for the cost of forbearance and did not list the cost of forbearance in pre-trial and post-trial damages calculations, it cannot recover these damages.

In its initial proposed findings, issued March 30, 2012, the Bankruptcy Court stated the following:

> The Trustee did not sue separately for, or introduce evidence of, the incremental costs to the Debtor (*e.g.*, the higher interest rates and forbearance fee) resulting from the violations of terms of the Revolver—focusing instead on the presumably much larger sums that the Debtor lost as a consequence of the American Tissue and other transactions. Thus the Court is not in a position to make findings or award damages for any additional losses resulting from this conduct.

(3/30/12 Proposed Findings 43–44.) In April 2012, the Trustee wrote to the Bankruptcy Court, arguing that it had overlooked Plaintiff's Exhibit 50, which purports to list the fees the Debtor incurred in connection with securing forbearance. The Bankruptcy Court ultimately agreed and, in the subsequently issued Proposed Findings at issue here, awarded the Trustee $2,311,613 as damages for the Officers' knowing violations of the Revolver based on Plaintiff's Exhibit 50. (*Id.* at 103.) [14]

 Defendants argue that the Bankruptcy Court erred in this regard because the Amended Complaint did not assert a separate cause of action for the cost of forbearance. The argument is misplaced. The Amended Complaint's first cause of action alleges that the Officers breached their fiduciary duties to the Debtor through transactions that, among other

---

14. The Bankruptcy Court did not include in its award of damages the fees and bonus the Debtor paid to RSI, which were separately listed in Plaintiff's Exhibit 50.

things, "jeopardiz[ed] the Debtor's own relationship with the Bank," i.e. Fleet. (Am. Compl.¶ 101.) The Amended Complaint's factual allegations repeatedly reference the Officers' conduct with regard to the Revolver, alleging, among other things, that the Debtor's financing of American Tissue's acquisition of Global Tissue Mills in 2000 and working capital loans to American Tissue in 2001 violated the Revolver as well as the Policy. (*Id.* ¶¶ 28, 32, 33.) A separate heading in the Amended Complaint titled "Violations of Revolving Credit Facility" lists the Debtor's alleged violations of the Revolver. (*Id.* ¶¶ 79–81.) The Amended Complaint further alleges, upon information and belief, that the Officers were aware at the time the advances to American Tissue were made that these were events of default under the Revolver and the Policy. (*Id.* ¶ 56.) As damages for the Officers' alleged breaches of fiduciary duty, the Trustee sought the undifferentiated sum of $30 million. (*Id.* ¶ 107.) Thus, although the Amended Complaint did not specifically mention the Forbearance Agreement, it unambiguously sought damages resulting from breach of the Revolver. Indeed, the Officers' counsel conceded as much at oral argument. (7/23/13 Tr. 31 ("[I]t's a fair read of the complaint that the trustee generally sought damages for causing the breach of the revolver as one of the several claims of fiduciary breaches in the complaint.").)

▮ The Officers also argue that the Trustee's failure to identify the cost of forbearance as a measure of damages in both a trial affidavit and its post-trial proposed findings of fact, each of which purported to calculate the Debtor's damages, forecloses recovery. Although the Trustee offers no explanation for these omissions, the Court is not persuaded that it forecloses the Trustee from recovering the damages at issue. The Amended Com-

plaint gave fair notice that the Officers' breach of fiduciary duty in connection with the Revolver was one ground on which the Trustee sought recovery, and the Trustee offered evidence of these damages at trial in the form of Plaintiff's Exhibit 50. The affidavit and proposed findings of fact submitted by the Trustee were not pleadings and did not constrain the Bankruptcy Court in its proposed factual findings.

### ii. *The Debtor's Liquidity*

▮ The Officers' sixth objection is that the Bankruptcy Court erred in finding that loss of the Revolver "would jeopardize the Debtor's critical liquidity, of which the Revolver was the only source . . . ." (PF 45.)

The Trustee's expert opined that, given the Revolver's outstanding balance of nearly $35 million at the end of 2000 (comprising 38% of the Debtor's book assets), termination of the Revolver would have forced the Debtor to liquidate. (Guth Aff. ¶ 6.) The Officers' expert, in contrast, testified that "technical defaults" under credit agreements—those that, like the defaults at issue here, result from "a violation of a covenant other than one requiring the repayment of interest or principal"—rarely result in termination of financing. (Fisch Report 5.) Consistent with this generalization, Fleet, on at least two occasions, agreed to waive the Debtor's technical defaults under the Revolver. In the Third Amendment to the Revolver, dated September 10, 1999, Fleet waived the default arising from the Debtor's "failure to meet the Single Customer Group Limitation set forth in Section 7.21, with respect to the American Tissue Companies, for the period commencing August 1, 1999 and ending on the date thereof." (PL's Ex. 4 § 3.) And, in the Fourth Amendment to the Revolver, effective as of October 2000, Fleet waived, "on a prospective basis, the

Defaults which would of necessity arise from the Borrowers' failure to comply with the Investment limitations and Nature of Business limitations set forth in Sections 7.06 and 7.12, respectively, of the Credit Agreement with respect to the Borrower's proposed $1,800,000 junior equity investment in that certain paper mill located in Samoa, California." (Pl.'s Ex. 5 § 2.)

Of course, as it happened, Fleet did not elect to retrospectively waive all of the Debtor's defaults, instead declaring the Debtor in default in November 2001, and the Debtor was only able to secure forbearance at a considerable cost. This is not altogether surprising given the nature of the defaults as well as the Debtor's financial condition. Even if the Debtor's defaults under the Revolver were properly categorized as "technical," they were nonetheless substantial. The Debtor acknowledged in the Forbearance Agreement that the extension of over $8 million in loans to American Tissue constituted a material adverse change in the Debtor's business. (Pl.'s Ex. 7 § 2.4(c)(i).) Indeed, by the time Fleet declared a default, the Debtor's Board had already decided to liquidate the Debtor. (PTO ¶ 5.54.)

 In short, there is ample evidence that the Officers' disregard for the terms of the Revolver jeopardized the Debtor's primary source of liquidity and in that respect constituted a breach of the duty of care. The Court rejects any suggestion that, under these circumstances, materially breaching the terms of the Revolver constituted a valid business judgment. (*See, e.g.*, 7/16/08 Tr. 83 ("[O]ur belief was and still is that it would have been easier to get a new bank if we had a problem with Fleet than it would be to find a new customer [with] the size and profitability of American Tissue . . . .").) If the Officers believed the transactions with American Tissue, which placed the Debtor in default

under the Revolver, were necessary for business purposes, they should have endeavored to secure Fleet's waiver of the default or an alternative source of financing in advance, rather than placing the Debtor in the position of buying its way out of jeopardy through a costly forbearance agreement. No cogent business judgment rationale has been adduced for waiting until the Debtor was declared to be in default to take protective action. Most emphatically, not all intentional breaches of contract with third-parties are breaches of fiduciary duty on the part of the officers who caused the breach of contract. Officers can make a rational business judgment to cause an efficient breach of contract. But, on this record, there is not evidence to support the conclusion that the Officers made such a rational business judgment with respect to the provisions of the Revolver.

### iii. *Harm To The Debtor From Breach Of The Revolver*

The Officers' seventh objection is that the Bankruptcy Court erred in finding that the Officers' knowing violations of the Revolver harmed the Debtor by requiring it to enter into the Forbearance Agreement. The Officers argue that, regardless of their conduct, Fleet planned to let the Revolver expire shortly after the date of the Forbearance Agreement and that the Forbearance Agreement, entered into once the Board had already decided to liquidate the Debtor, benefited the Debtor by allowing for an orderly wind down of its operations.

The November 2001 Forbearance Agreement recites that Fleet had notified the Debtor in October 2001 of its intention to allow the Revolver to expire in January 2002. (PL's Ex. 7 § 2.4(b).) Indeed, Fleet knew of the Debtor's defaults in June 2001 (PL's Kelly Aff. ¶ 11), but did not declare a default until November 2001,

only weeks before the Revolver was due to expire according to its terms unless renewed. In light of this, the Officers argue that the Bankruptcy Court "wrongly found that Fleet Bank's decision to forbear resulted solely from the Officer[s'] violations of the Revolver as opposed to Fleet Bank's own decision to not renew the Revolver and allow it to expire a mere seven weeks later." (Defs.' Objs. 54.)

 The Officers' argument must be rejected as it proceeds from the false premise that Fleet's decision to forbear was the source of harm to the Debtor, as opposed to the means by which a greater harm—immediate acceleration of the full principal and accrued interest under the Revolver—was mitigated. (Pl.'s Ex. 1 § 8.01.) The issue is not whether the Officers caused Fleet to forbear. The issue is whether the Officers' actions made it necessary for the Debtor to either secure forbearance (at a cost) or face immediate termination of the Revolver. Even if Fleet would have declined to renew the Revolver in January 2002, the damages found by the Bankruptcy Court were not the cost of losing the Revolver in January, but the cost of securing forbearance until then. If the Officers had not caused a default under the Revolver, the high cost of the Forbearance Agreement could have been avoided. True, the Debtor might have sought an extension of the maturity date or an extended repayment schedule, as were provided in the Forbearance Agreement, but that would have been a fundamentally different negotiation, with different costs and consequences, had the Debtor not been in default.

### iv. *The Cost Of Forbearance*

The Officers' eighth objection is that the damages found by the Bankruptcy Court— the costs of securing forbearance—were speculative. The Officers argue that Plaintiff's Exhibit 50, which sets out the cost of forbearance, lacks foundation. But the parties stipulated to the admissibility of that exhibit in a joint pre-trial order. (PTO ¶ 12(a)(50).) Furthermore, Kelly swore that Plaintiff's Exhibit 50 was a true copy of fees paid to Fleet as a result of the various defaults declared by Fleet with respect to the Revolver (Pl.'s Kelly Aff. ¶ 18) and neither Koplik nor Siegel was able to dispute the accuracy of the exhibit (Koplik Dep. 108–109; Siegel Dep. 77–78). Moreover, although Kasoff could not recall who had prepared the exhibit, he gave an explanation of the fees listed in it at trial. (4/15/2008 Tr. 111–112.) Thus, insofar as the objection relates to the admissibility of the exhibit as evidence of the cost of forbearance, it is overruled.

 The Officers also argue that the Trustee recovered a portion of the forbearance costs from Fleet in a 2003 settlement of a separate interpleader action, *Fleet Capital Corp. v. Perry H. Koplik & Sons, Inc., et al.,* Adv. Pro. No. 02–03060 (Bankr. S.D.N.Y.) (REG), of which they ask that the Court take judicial notice. The Trustee responds that this argument was not raised before the Bankruptcy Court, even though the separate adversary proceeding was settled with Bankruptcy Court approval years before the Bankruptcy Court issued the Proposed Findings, and, in any case, the amount at issue was paid as part of a global settlement with Fleet and did not represent return of a portion of the forbearance fees. Double recovery is, of course, not permitted, but the Officers have not come forward with any indication that the amount recovered by the Trustee in that proceeding constitutes the return of any of the costs of forbearance found in Plaintiff's Exhibit 50.

### c. *Loan Forgiveness*

The Officers' final two objections relate to their forgiveness of loans to themselves

in December 2001. The Officers do not challenge the Bankruptcy Court's finding that the Debtor was insolvent at that time. (PF 69.) Instead, the Officers argue that they gave reasonably equivalent value for the forgiveness of the loans and therefore the transactions did not constitute constructive fraudulent conveyances under the Bankruptcy Code or state law, nor did they constitute breaches of fiduciary duty. 11 U.S.C. §§ 544, 548, 550; N.Y. Debtor & Creditor Law §§ 273, 278; *see generally Amusement Indus., Inc. v. Midland Ave. Associates, LLC,* 820 F.Supp.2d 510, 526 (S.D.N.Y.2011) (adopting Report and Recommendation); *In re Operations N.Y. LLC,* 490 B.R. 84, 96 (Bankr.S.D.N.Y. 2013); *In re Dreier LLP,* 462 B.R. 474, 487 (Bankr.S.D.N.Y.2011). For reasons stated below, the Court finds, as did the Bankruptcy Court, that the Officers did not give reasonably equivalent value for the forgiveness of their loans and that the transactions constituted constructive fraudulent conveyances and breaches of fiduciary duty.[15]

### i. *Koplik Loan*

It is undisputed that the Debtor loaned Koplik $299,800 and that his obligation to repay the loan was forgiven by the conversion of the loan into compensation as of December 31, 2001, and included in his W–2. (PTO ¶ 5.56.) While not denying that the loan was forgiven, Koplik states in his affidavit that "I paid the Debtor $264,347.10 in order to enable it to satisfy its obligation to pay federal and state withholding taxes that arose as a result of my receipt of forgiveness of indebtedness income" and that "[t]he Debtor thus received reasonably equivalent value in exchange for the loan forgiveness." (Koplik Supp. Trial Aff. ¶ 37.) Koplik also states that "I

deny any fraudulent intent in accepting the forgiveness, which was discussed with and approved by Mr. Kasoff prior to its occurrence." (*Id.*) At trial, Koplik again testified that the loan forgiveness "was Mr. Kasoff's advice and at that time I was—with the advice of counsel and so many people, so everybody seemed to think that this was appropriate." (5/15/08 Tr. 84; *see id.* at 85 ("All I know is that Kasoff did what was necessary to have this organized and Paul Weiss agreed. As I said before, at this point in time I wasn't making any of these decisions on my own."); *id.* at 86 ("I assumed that since my counsel and the chief restructuring officer and the bank were all aware of this that it was in order and was acceptable to everybody.").) Kasoff testified at trial that he recommended to Koplik that the loan be converted to income, albeit "subject to obtaining approval and notifying the steering committee of the creditor's committee." (4/15/08 Tr. 99.)

Koplik's argument that his payment to the Debtor was to assist the Debtor in satisfying its tax liability, as opposed to his own, is significantly undermined by other evidence in the record. When asked at trial whether he paid the Debtor roughly $264,000 "for the benefit of your personal income tax," Koplik answered that he was "not quite certain." (5/15/08 Tr. 84.) Moreover, Kasoff testified that, while he had seen documents indicating that Koplik transferred approximately $264,000 to the Debtor around the time of the loan forgiveness, this transfer was "certainly not related to the repayment of the loan." (4/15/08 Tr. 99.) Finally, Defendants' Exhibit 62 is an email, dated November 8, 2006, from Christopher R. Belmonte, counsel to the Trustee, to Sanford Rosen, coun-

---

**15.** Because the Court, upon *de novo* review, reaches the same result as the Bankruptcy Court, it is not necessary to decide whether the Bankruptcy Court was constitutionally empowered to enter judgment on the fraudulent transfer claims.

sel to Koplik, that attaches certain documents related to Koplik's transfer of roughly $264,000 to the Debtor. Among the documents is a statement of the Debtor's account with Fleet, showing the transfer of approximately $264,000 from Koplik to the Debtor. (*Id.*) Also attached are faxes from Koplik authorizing the transfers and a number of hand-written or hand-annotated documents of unknown origin that appear to show the computation of Koplik's personal taxes. (*Id.*) In the cover email, Belmonte states that "[w]e think the attached shows payment of taxes by Michael Koplik at y/e 01, not repayment of the loan." (*Id.*)

On the totality of the evidence, the Court agrees with the Bankruptcy Court that Koplik did not give reasonably equivalent value to the Debtor in the form of his approximately $264,000 tax payment. (*See* PF 62 ("It is . . . impossible to see how the Debtor could have tax liability for a transaction that, for the Debtor, resulted in a loss or incremental expense.").) The only evidence in the record to indicate that Koplik's payment to the Debtor was a repayment of the loan is Koplik's affidavit, which the Court does not credit given the implausibility of the explanation. The Trustee carried his burden to show that the loan was forgiven at a time when the Debtor was insolvent and that Koplik did not give reasonably equivalent value in exchange.

### ii. *Siegel Loan*

It is undisputed that the Debtor loaned Siegel $100,000 and that, as of December 31, 2001, his obligation to repay was forgiven by the conversion of the loan into compensation and included in his W–2. (PTO ¶ 5.57.)

Siegel stated in his trial affidavit that "[t]he forgiveness of the loan was done pursuant to a long-standing agreement with the Debtor, set forth in a 1996 written memorandum," explaining that, "[i]n the memo I sent to Mr. Koplik and which he approved, I agreed to defer $100,000 in compensation then due to me and the Debtor agreed that the loan would be forgiven upon my retirement." (Siegel Supp. Trial Aff. ¶ 142.)

The memorandum consists of a one-page handwritten note to "MRK" (presumably Koplik) from "AS" (presumably Siegel), dated June 3, 1996, regarding "Finalize 1995 Compensation plus 1996 Salary." (Defs.' Ex. 60 (the "June 3 Memo").) It states the balance due to Siegel as of its date as $227,000. (*Id.*) Then, under the heading "Suggestion For Payment," it states, "Defer 100,000 until after AS 'retirement' and use to offset against loan to AS of 100,000 now on books as employee loan." (*Id.*) As stated in the June 3 Memo, this would result in a payment to Siegel on or before July 1, 1996, of $127,000. (*Id.*)

Koplik corroborated Siegel's account of the loan forgiveness, stating that he "approved a memo sent to me by Mr. Siegel where he agreed to defer $100,000 in compensation then due to Mr. Siegel and the Debtor agreed that the loan would be forgiven upon his retirement." (Koplik Supp. Trial Aff. ¶ 33.) At trial, Koplik testified that the June 3 Memo "accurately reflects what was agreed on June 3, 1996." (5/15/08 Tr. 81.) That said, he could not recall whether he had approved the June 3 Memo in writing, whether he had seen any writing approving it, whether it was kept with the Debtor's books and records (although he believed it should have been), or whether the loan was carried as an asset. (*Id.*) Koplik did acknowledge that he was aware that the loan to Siegel was not written off as forgiven until 2001, explaining that this was because the forgiveness was not to take effect until Siegel's retirement. (*Id.* at 82.)

Consistent with Koplik's testimony, Siegel testified that he had received oral, but not written, approval of the June 3 Memo from Koplik. (7/17/08 Tr. 35.) Siegel testified that he was aware that the Debtor's financial statements had reported his loan as an asset, explaining that "Koplik preferred that it not be shown as an expense or as income to me" because Siegel was making more money than Stein, who had been at the Debtor longer. (*Id.* at 36–37.) He also testified that he knew a copy of the June 3 Memo was kept in his employment file in Kelly's office because he checked every year:

Q. How do you know it was in there?

A. I asked him about it. For every year at the preparation of the financial statements the auditors ask me to sign a confirmation that there was a $100,000.00 note payable and not an account receivable, a loan receivable.

Q. Right.

A. And before I signed it after this 1996 agreement I went into Kelly and said, I'll sign it but just make sure this document is in my employment file.

Q. Why did you care if it was in the file?

A. Because I wanted it understood that it was going to be forgiven. So he took out the employment file and showed it to me.

Q. You were being asked by the auditors to confirm that you owed the money?

A. Yes.

Q. So it was important for you to confirm that the company knew that it was not going to get collected?

A. Correct. But I did owe it according to the paperwork until my retirement.

(*Id.* at 126–127.) And, later:

Q. Why wasn't the liability to you reflected on the books and records?

A. In order to establish the liability one would have to establish the expense.

Q. So why wasn't it established?

A. Because our expenses were too high, we didn't want to increase the expenses and in doing it at that time it would have reflected an increase in my salary. That, Mr. Koplik did not want particularly Mr. Stein to know about.

(*Id.* at 128.)

Faced with this testimony, the Bankruptcy Court determined that "[r]ather than finding that Koplik and, especially Siegel, lied to Arthur Andersen and executed knowingly false confirmations, the Court finds that the document never evidenced anything other than the 'suggestion' it said it was." (*Id.* at 67.) The Court adopts the Bankruptcy Court's proposed finding. Stein left the Debtor for American Tissue in 1999 (PTO ¶ 5.120), but the loan continued to be recorded as an asset on the Debtor's books in 2000 (Kasoff Aff. ¶ 58), undermining Siegel's explanation for keeping the purported agreement secret. Moreover, although, pursuant to the June 3 Memo, Sigel's loan would have been forgiven upon his retirement, the loan was forgiven in December 2001, which coincides neither with Siegel's "official[ ]" retirement in January 2002 (7/16/08 Tr. 6) nor with his unofficial retirement and relocation to Florida at the end of September 2001. (7/16/08 Tr. 6–7.)

## V. *Prejudgment Interest*

Although not addressed in the Proposed Findings, the Trustee argues that he is

entitled to prejudgment interest on his claims for breach of fiduciary duty as a matter of right. The Officers take issue with the date from which interest should accrue.

New York law allows for the recovery of prejudgment interest on claims for breach of fiduciary duty at the statutory rate of 9% simple interest per annum. CPLR §§ 5001(a), 5004; *see Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508–09 (2d Cir.1991) (applying New York law). Such "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." CPLR § 5001(b).

■■■ As to breaches of duty related to the Policy, the Trustee initially argued that prejudgment interest began to accrue on March 5, 2001, the date of the Debtor's re-aging of American Tissue receivables, but conceded at oral argument that the earliest date from which interest could accrue was November 12, 2001, the date on which Kemper denied the Debtor's claim. (7/23/13 Tr. 7.) The Officers argue that the correct date is the (unidentified) date in 2002 when the coverage dispute with Kemper was resolved. The Court concludes that prejudgment interest should accrue from November 12, 2001, when Kemper denied the Debtor's claim under the Policy, because that is the first date on which the Debtor was denied the funds that it might otherwise have received under the Policy and was thereby harmed by the Officers' breach of duty; it is the first date on which the Debtor had a cause of action for the Officers' failure to comply with the terms of the Policy.

■■■ As to breaches of duty related to the Revolver, the Trustee takes the position that prejudgment interest should also run from November 12, 2001, which is also the date of the Forbearance Agreement. The Officers argue that the earliest date on which prejudgment interest could accrue would be the date the Debtor actually paid, as opposed to agreed to pay, the incremental costs associated with the Forbearance Agreement, which date the Officers do not identify. The Forbearance Agreement sets out a schedule for repayment between November 12, 2001, and February 15, 2002. (Pl.'s Ex. 7, Schedule 1.2.) The Bankruptcy Court's damages calculation was based on Plaintiff's Exhibit 50, which lists the fees the Debtor paid as a result of the various defaults declared by Fleet with respect to the Revolver. (Pl.'s Kelly Aff. ¶ 18.) The exhibit gives dates for some, though not all, of these payments. The earliest date given is November 12, 2001, the date of the Forbearance Agreement. (Pl.'s Ex. 50.) The latest date given is March 6, 2002. (*Id.*) In view of the above, the Court is unable to fix an exact date for each cost associated with securing forbearance, but it appears reasonably certain that these costs, although paid a various times, were in any event all paid by March 6, 2002. Thus, the Court assigns March 6, 2002, as the accrual date for prejudgment interest on damages stemming from the Debtor's breach of the Revolver.

### CONCLUSION

For the reasons stated above, all of the objections to the Bankruptcy Court's Proposed Findings are overruled. Plaintiff is entitled to prejudgment interest to the extent stated herein. The Proposed Findings of Fact and Conclusions of Law after Trial (as Amended) are adopted, except as indicated in footnotes 2 and 10. Plaintiff is

directed to submit a proposed judgment within 14 days.

SO ORDERED.